UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JENNIFER PENNINGTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 1:13-cv-1396-WTL-TAB |
| | ) |
| INDIANAPOLIS METROPOLITAN | ) |
| POLICE DEPARTMENT, et al., | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendants' motion for summary judgment (dkt. no. 32). The motion is ripe for ruling,[1] and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons set forth below.

**I.     STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required

---

[1] The Defendants did not file a reply in support of their motion; however, the time for doing so has passed.

to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The relevant facts of record, viewed in the light most favorable to the Plaintiff Jennifer Pennington, the non-moving party, are as follow.

### A. The Arrest

On September 3, 2011, Indianapolis Metropolitan Police Department ("IMPD") Officers Benjamin Owens and Jeffrey Terry stopped for lunch at the Dairy Queen located at 3826 English Avenue, Indianapolis, Indiana. As they walked towards the restaurant, they observed Pennington sitting in the driver's seat of a parked car inhaling or "huffing" from an aerosol can of duster. Pennington had started huffing approximately one hour earlier. The officers approached Pennington's car to investigate the matter further. Officer Terry approached the driver's side of Pennington's car, and Officer Owners approached the passenger side. Officer Terry asked Pennington to step out of her car, and Pennington complied with his request. Pennington, however, was incoherent and unable to stand without support. At this time, Officer Owens reached into the car through the passenger side of the car and removed Pennington's keys from the ignition.

As Officer Terry attempted to engage in a conversation with Pennington, she quickly reentered her car and reached for the can of duster. Pennington knew that she was being arrested, and, in Pennington's own words, she "went to go grab the can of duster," because she wanted to "use [the] duster before [she] went to jail." Dkt. No. 34-1 at 31.

As Pennington huffed more duster, the officers grabbed the can from her and once again ordered her to step out of her vehicle, but Pennington did not comply. As a result, Officer Terry,

still standing on the driver's side of the vehicle, grabbed Pennington's left arm, and Officer Owens, leaning into the car from the passenger's side, grabbed her right arm. At this time, Pennington briefly blacked out. The parties differ as to what occurred next.

According to the officers, Officer Owens struggled to remove Pennington from the driver's side of the vehicle, and Officer Terry struggled to remove her from the passenger's side. Pennington, however, immediately began struggling with them, flailing her arms, and resisting their attempts at removing her from the car. She lunged toward the passenger side of the car, which was cluttered with various unknown items.[2] When this happened, she broke free from Officer Terry's grip. Pennington also reportedly struck Officer Owens and attempted to bite him. Officer Owens then broke contact with Pennington and warned her that if she did not stop resisting, he would use his taser. Because Pennington did not comply with Pennington's warnings, he deployed his taser, which produced an approximate 5-second shock. Pennington, however, continued to move around inside her vehicle and resist arrest. Officer Owens warned Pennington that if she did not stop resisting, he would tase her again. Pennington continued to resist, and Officer Owens deployed his taser a second time. At that time, Pennington finally stopped resisting and complied with the officers' orders. She was thereafter handcuffed and placed under arrest without any further incident.

According to Pennington, however, when she came to from her black out, she "had an officer on each end." *Id.* at 33. She further described the incident as follows:

> [T]he officer that was on the passenger's side, he was just grabbing me and yanking me, like ripping me by the arm. And he just kept tugging and tugging and tugging, and . . . I told him, . . . "Stop, you're breaking my arm. Stop, you're hurting me."

---

[2] Officer Owens testified that, for all he knew, Pennington could have been reaching for a weapon.

3

> And at the same time the officer had me from the other side in the driver's door, and . . . I remember him yelling and I remember him saying something about it being real nice about what I was doing in front of little kids.
>
> . . . I didn't know what to do because I wanted to get out of the car but I have two people pulling me in two different directions, . . . but I kept telling [the officer on the passenger side] "You're breaking my arm, you're breaking my arm."
>
> . . . And then I remember . . . saying [to the officer on the driver's side"] "Tell [the officer on the passenger side] to let go, tell him to let go." . . . [A]nd I said, "Let me out, . . . let me get out."
>
> And at some point . . . the officer on the driver's side, he said "I got it, I got it, I got it." . . . And when he did that, the other officer kinda let back a little bit on me, and as I'm trying to get out, . . .I'm tased.
>
> . . .
>
> And then . . . they're yelling for me to get out, and before I get out, I'm tased again.

*Id.* at 33-35. Pennington denies that she ever resisted the officers, and she believes her mind was "already clear when [she] was getting ripped out of [the] car." *Id.* at 41. The intake form from the jail states, however, that Pennington "state[d that] she blacked out, and [had] no knowledge of [her] arrest." Dkt. No. 34-5 at 4.

### B. Pennington's Injuries and Medical Treatment

Pennington was treated at the scene by paramedics. She complained to them that her arm was hurting. There was a taser prong in her arm, and the paramedic removed it. At that time, she did not complain about her shoulder, as she did not think her shoulder was injured. Dkt. No. 34-1 at 40.

When Pennington arrived at the jail, she underwent a medical screening. At that point, she complained to everyone she encountered that her arm and shoulder were hurting. In fact, according to Pennington, when an officer took off her handcuffs in the booking room, her arm

4

"was stuck up in the position behind [her] back. It wouldn't come down. It was locked up there. [She] had to manually move it, [to] put it into place." *Id.* at 43. She was given an aspirin or Tylenol after she arrived at the jail. The medical screening form confirms that Pennington complained of right shoulder pain and tenderness. The form notes, however, that there was no bruising and no abrasions. Pennington claims that there was not a true physical examination during the intake process. A person just "looked at [her] shoulder through [her] shirt and . . . said [she] was fine." *Id.* at 50. Another person in the booking area also looked at her shoulder through her shirt and said she was fine. Despite Pennington's requests for further medical attention and to be taken to the hospital, no further medical treatment was provided.

Pennington continued to complain about her shoulder pain to anyone who would listen. After she arrived at her assigned cell block, she pressed the emergency call button because she could not stop crying because of the pain. Again, her shoulder was examined through her shirt. This time, she was also questioned about her mental health history. She informed medical personnel that she suffered from PTSD, depression, and a panic disorder, and they gave her Trazodone and Seroquel. She did not, however, receive any treatment for her shoulder.

At some point, a female nurse removed her shirt and examined her shoulder. The nurse did not find anything wrong.

Pennington continued to push the emergency button and complained about her shoulder. Eventually, the guards quit responding to her emergency calls.

On the second or third day, Pennington submitted a formal request for medical attention.[3] On the third day, she was taken to a medical office and x-rays were ordered.

---

[3] Pennington claims that another inmate helped her with this. The Defendants argue, however, that Pennington was instructed during the intake process about how she could request medical attention twenty-four hours a day.

5

On the fourth day, before the x-rays were taken, Pennington was transferred to Liberty Hall.[4] She informed the staff at Liberty Hall about her shoulder pain and requested medical attention. She was examined by a nurse, who rebuffed her complaints.

On the fifth day, September 8, 2011, Pennington was transferred back to the Marion County Jail where x-rays were taken of her shoulder. A doctor informed her that she had a dislocated shoulder and a fracture. She was then transferred to Wishard Memorial Hospital for further treatment. She was diagnosed with an "[a]nterior shoulder dislocation with associated coracoid process [fracture]," and received treatment for her injuries. Dkt. No. 34-8. After less than twenty-four hours, she was transferred back to the jail with a sling and pain medications. However, she never received the pain medications after she arrived back at the jail. Eventually, a public defender conveyed to her a plea deal offered by the prosecutor's office.[5] Pennington agreed to plead to a felony battery charge in exchange for the dismissal of the remaining counts against her. According to Pennington, she "would have pled guilty to anything they wanted," so that she could "get out to get medical attention and relief for [her] injury." Dkt. No. 34-1 at 55.[6]

After she was released from jail, Pennington visited the emergency room because she thought her "shoulder . . . was falling out." *Id.* She was prescribed physical therapy and referred

---

[4] The Court takes judicial notice of the fact that Liberty Hall was a privately run jail facility for female offenders in Marion County.

[5] Pennington was initially charged with one count of battery on an officer, a Class D felony, one count of resisting law enforcement, a Class A misdemeanor, one count of glue sniffing, a Class B misdemeanor, and one count of public intoxication, a Class B misdemeanor.

[6] The Court notes that Pennington has not alleged any claims related to her allegation that she pled guilty only to receive treatment for her shoulder pain in this case (in other words, that her guilty plea was involuntary).

to orthopedic doctors. Because her shoulder lacked stability and "kept repetitively falling out," *id.* at 88, Pennington had a partial shoulder replacement and a hemiCAP implant to stabilize her shoulder socket in 2013.

Pennington continues to suffer from pain and a loss of mobility in her right arm.[7]

## III. DISCUSSION

Pennington's complaint alleges claims against the IMPD, the City of Indianapolis, the Marion County Sheriff, Marion County, Officer Terry, and Officer Owens. She alleges that (1) Officer Terry and Officer Owens used excessive force against her,[8] and (2) jail personnel willfully failed "to provide Plaintiff with prompt and timely medical care."[9] Compl. at ¶ 16. Both claims are discussed in further detail below.

### A. Claims against the IMPD

First, the Defendants argue that the IMPD is not a "separate suable entity," because "a city's police department is not a suable entity apart from the municipality." Defs.' Br. at 8-9 (quoting *Martin v. Teusch*, No. 1:09-cv-321, 2010 WL 1474525, at *2 (N.D. Ind. 2010)). This is true. A claim against a municipality's police department is effectively a claim against the municipality, and naming the police department adds nothing. *See West v. Waymire*, 114 F.3d 646, 646-47 (7th Cir. 1997) ("The naming of the Town's Police Department as a defendant adds nothing; it is almost certainly not a suable entity separate from the Town."). Because Pennington

---

[7] Apparently, Pennington had a preexisting shoulder injury, and the acts of the Defendants aggravated the preexisting injury. Compl. at ¶ 19.

[8] Pennington names Officer Terry, Officer Owens, the IMPD, and the City of Indianapolis as Defendants to this claim.

[9] Pennington names Marion County and the Marion County Sheriff as Defendants to this claim.

7

has also sued the City of Indianapolis, the Court **GRANTS** the Defendants' motion in this respect.

### B. Excessive Force Claims against Officer Terry, Officer Owens, and the City of Indianapolis

The Defendants argue that they are not liable to Pennington because they acted reasonably under the circumstances, and assuming they acted unreasonably, they are entitled to qualified immunity. For these same reasons, the Defendants also argue that Pennington's *Monell* claim against the City cannot survive.[10]

"[A]ll claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

> [T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> . . .
>
> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> . . .

---

[10] *Monell* refers to the Supreme Court case *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (holding that local governments may be found liable under § 1983 for constitutional deprivations caused by an official policy or custom).

> [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Id.* at 396-97 (citations and quotation marks omitted).

There were effectively three uses of force exercised by the officers in this case: (1) The officers grabbed Pennington's arms and attempted to pull her from her car after she reentered it to inhale more duster; (2) Officer Owens deployed his taser on Pennington while she was still in her vehicle; and (3) Officer Owens tased Pennington a second time before she finally exited her vehicle. Each use of force is analyzed below.

### 1. Initial Use of Force – Grabbing and Pulling Pennington's Arms

When the officers grabbed Pennington's arms and attempted to pull her from the car, she was openly committing a crime, she was not complying with the officers' instructions (as evidenced by her reentering the car to inhale more duster), there was a possibility that she could be reaching for a weapon, and she was, for all intents and purposes, resisting arrest. In light of these circumstances, the officers' actions were objectively reasonable. Although the officers were pulling in opposite directions, they were both faced with these facts, and it was reasonable for them to react in the manner that they did. Accordingly, the Defendants' motion for summary judgment is **GRANTED** with respect to the officers' initial use of force. The City, Officer Terry, and Officer Owens are not liable to Pennington for grabbing her and attempting to pull her from the car.

### 2. Second and Third Uses of Force – The Taser

The answer is not as clear with regard to Officer Owens' decision to tase Pennington—either the first or the second time. According to the officers, Pennington continued to struggle and resist arrest. Under the officers' version of events, their actions were objectively reasonable.

9

However, according to Pennington, she did not resist, she repeatedly told Officer Owens that he was hurting her arm, she told the officers that she wanted to and was trying to get out of the car, she told Officer Terry to tell Officer Owens to stop pulling on her arm, and, at some point, Officer Terry reportedly told Officer Owens that he had the situation under control. After all that, Officer Owens stepped back from the car and tased Pennington. Then, Officer Owens deployed his taser a second time, before she was able to exit her vehicle. Under her version of events, it is questionable whether Officer Owens' taser use was reasonable. Because there are competing versions of what occurred, and the Court must view the facts in the light most favorable to Pennington, the Court finds that there are questions of fact regarding whether Officer Owens' actions were unreasonable and excessive that preclude summary judgment.[11]

### 3. Qualified Immunity

Notwithstanding the foregoing, the Defendants argue that, regardless of whether Officer Owens acted reasonably, they are entitled to qualified immunity. "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citations omitted). In determining whether a defendant is entitled to qualified immunity, courts must determine: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant[] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

---

[11] The Court notes that Pennington has not argued that Officer Terry is liable to her for failing to intervene to prevent Officer Owens from using his taser. Thus, he is not a Defendant to any claim related to the use of the taser.

As discussed above, Pennington has alleged sufficient facts to withstand summary judgment on her excessive force claims related to Officer Owens' taser use. As to the second prong of the inquiry, that is: whether the law was clearly established on September 3, 2011, that Officer Owens' taser use violated the Fourth Amendment right to be free from excessive force, the Court finds that Pennington has satisfied her burden.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). A case directly on point is not required, "but precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 131 S.Ct. at 2083.

"Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 727-28 (7th Cir. 2013) (citations omitted). However, the use of a taser against a person who is not resisting has been found to violate clearly established law. Indeed, the Seventh Circuit has noted as follows regarding the use of a taser on non-resisting individuals:

> In 2009, we found that it had been clearly established in 2006 that a taser could not be used against a prone, weakened, and docile prisoner who had been told to rise one time, had not been warned that failure to comply would result in use of a taser, and had been zapped before having a chance to comply with the order to rise. . . . If it was clearly unlawful in 2006 to use a taser on a moving prisoner who had been ordered to rise, then it surely was clearly unlawful a year later to use a taser on a noncompliant, nonmoving misdemeanor arrestee who had already been immobilized by an initial taser jolt. . . . And more recently, we held that it was clearly established in 2005 that officers could not repeatedly use an impact weapon to beat into submission a person who was not resisting or was merely passively resisting officers' orders. . . . Additionally, since 2007, many of our sister circuits have found the use of a taser against nonviolent, nonresisting misdemeanants to violate clearly established law, the absence of taser case law notwithstanding. . . .

*Id.* at 733 (citations omotted). Because the facts are disputed, the Court is unable to find that the Defendants are entitled to qualified immunity with regard to Pennington's excessive force claims related to Officer Owens' taser use. As such, the Defendants' motion for summary judgment is **DENIED** as to the excessive force claim related to Officer Owens' taser use.

### 4. *Monell Claims against the City*

The Defendants also argue that they are entitled to summary judgment on Pennington's *Monell* claims. A municipality may be liable under § 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "'Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy which policy can be attributed to a municipal policymaker.'" *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997) (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985)).

Pennington characterizes her *Monell* argument as follows:

> There is evidence that [Officer] Terry's and [Officer] Owens' violation of Pennington's constitutional rights was a result of the police department's policy about the amount of force the police may use when making an arrest. It appears that the general orders provide nothing more than guidelines or suggestions – in reality, the department's policy is that the police are given their own and sole discretion in determining the amount of force when making arrests.
>
> . . .
>
> [W]hen [Officer] Owens and [Officer] Terry exerted unreasonable force, it was because the policy of the [IMPD] allowed the use of unreasonable force and condoned such behavior.

12

Pennington's Resp. at 16.[12]

The IMPD's General Order ("GO") 1.30 contains detailed policies, procedures, and guidelines concerning the reasonable use of force. Dkt. No. 34-9 at 9-16. GO 1.30 states that "[i]t is the policy of the department that officers shall use only that amount of force that is reasonable, given the facts and circumstances known by the officer at the time of the event." *Id.* at 9. The GO then goes on to list various factors (including those identified in *Graham*) that officers should consider with regard to the use of force. Thus, Pennington is correct that the IMPD has a policy that allows officers to determine the amount of force that must be used in a particular situation. This, however, is by no means unconstitutional. Indeed, the Supreme Court has recognized that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

In short, Pennington has not alleged sufficient facts to support a finding that the unconstitutional act at issue in this case (i.e., Officer Owens' use of his taser) was caused by an official policy or custom. To the contrary, the IMPD has constitutional policies in place related to the reasonable use of force. To the extent Pennington alleges a widespread custom, her claim also fails because she fails to designate any evidence that the practice occurred more than once. Indeed, such a "claim requires more evidence than a single incident to establish liability."

---

[12] In her brief, Pennington notes that "[t]he United States Supreme Court has stated that there is a need to train police officers as to the constitutional limitations on the use of deadly force." *Id.* This sentiment, however, stops there. The Court thus finds that any *Monell* argument related to an alleged failure to train is considered waived. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 875 (7th Cir. 2013) (undeveloped and unsupported arguments are waived).

*Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Accordingly, no liability can extend to the City under *Monell*, and the Defendants' motion for summary judgment is **GRANTED** in this respect.

### C. Medical Claims against Marion County and the Marion County Sheriff

First and foremost, Pennington's claim against the Marion County Sheriff[13] is really a claim against Marion County and will be treated by the Court as such. *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (Grieveson's claims against the Sheriff in his official capacity are treated as claims against Marion County itself.").

"Governmental entities cannot be held liable for the unconstitutional acts of their employees unless those acts were carried out pursuant to an official custom or policy." *Id.* (citing *Monell*, 436 U.S. at 694).

> In order to survive summary judgment on a § 1983 official-capacity claim, the plaintiff must present evidence demonstrating the existence of an "official policy, widespread custom, or deliberate act of a county decision-maker of the municipality or department." *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007). Further, the plaintiff must show that the official policy or custom was the *cause* of the alleged constitutional violation—the "'moving force' behind it." *Estate of Sims,* 506 F.3d at 514 (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

*Id.*

Pennington argues that "the widespread custom or policy of the Marion County Jail is to ignore inmates with substantiated injuries that are in great and constant pain and that it is their policy to ignore such inmates, or inadequately identify injuries, and deny them prompt medical

---

[13] Pennington uses the terms "Marion County Sheriff" and the "Marion County Sheriff's Office" interchangeably in her complaint. Therefore, the Court assumes that the claim against the Marion County Sheriff is against the Sheriff in his official capacity, only.

care and treatment." Pennington's Resp. at 20.[14] Thus, Pennington alleges both a widespread custom claim and a failure to train claim.[15] Both arguments are addressed below.

### 1. Widespread Custom

As noted above, "in the 'widespread practice' implicit policy cases . . . , what is needed is evidence that there is a true municipal policy at issue, not a random event." *Calhoun*, 408 F.3d at 380. Thus, "the claim requires more evidence than a single incident to establish liability." *Id.* (citing *City of Okla. v. Tuttle*, 471 U.S. 808, 822-23 (1985)). Pennington, however, fails to designate any evidence that the practices she complains of were widespread or occurred more than once. Accordingly, Pennington cannot succeed under a widespread custom theory.

### 2. Failure to Train

As noted above, Pennington also argues that Marion County inadequately trained the jail personnel. "To prevail [on a failure to train claim, a plaintiff] must show that the [municipality's] employee violated his constitutional rights, that the [municipality] had a policy or custom of failing to train its employees, and that the failure to train caused the constitutional violation." *Roach*, 111 F.3d at 549 (citation omitted). "In particular, . . . the inadequate training of police officers could be characterized as the cause of a constitutional tort if—and only if—the failure to

---

[14] Pennington also restates her argument as follows: "The guards followed departmental policy by ignoring Pennington's complaint and failing to implement prompt and speedy medical care for her as well as all of the inmates, or were so inadequately trained that they could not identify a dislocated shoulder and see that Pennington received prompt medical care." *Id.* at 18-19.

[15] Pennington also argues, in passing, that "the Marion County Sheriff, as the final policymaking authority for the jail, is responsible for what happened to Pennington." *Id.* at 18. Pennington, however, fails to designate any evidence indicating that what happened to her was caused by a deliberate act of the Sheriff.

train amounted to 'deliberate indifference' to the rights of persons with whom the police come into contact." *Id.* (citation omitted).

Again, Pennington has not designated any evidence to support such a claim. She argues that the jail personnel were inadequately trained, but she provides no evidence regarding the training or the official policies at the jail. Additionally, and more importantly, as noted above, Pennington has designated "no evidence to take this case outside the realm of an isolated incident." *Roach*, 111 F.3d at 549. Therefore, as to Pennington's claims against Marion County and the Marion County Sheriff, Defendants' motion for summary judgment is **GRANTED**.

### D. State Law Battery Claims

Pennington's complaint consists of two delineated counts: Count I alleges claims of excessive force, and Count II alleges a claim regarding the medical treatment Pennington received at the jail. In their motion for summary judgment, the Defendants argue that, to the extent Pennington's complaint alleges a state law battery claim, the Defendants are entitled to summary judgment. In response, Pennington argues, without much support, that her "state law claims withstand the entry of summary judgment." Pennington's Resp. at 21. It is unclear to the Court whether Pennington is pursuing a state law battery claim against the Defendants.

It is clear, however, that Officer Terry and Officer Owens are immune from personal liability under Ind. Code § 34-13-3-5(b), because they were acting within the scope of employment at the time of Pennington's arrest. That statute provides as follows:

> A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally. However, if the governmental entity answers that the employee acted outside the scope of the employee's employment, the plaintiff may amend the complaint and sue the employee personally.

I.C. § 34-13-3-5(b). Pennington alleged in her complaint that Officer Terry and Officer Owens "have been at all relevant times employed by The City of Indianapolis and the [IMPD] as duly appointed police officers in this Judicial District acting within the course and scope of their employment and under color of law." Compl. at ¶ 5. The Defendants admitted this fact in their answer. Thus, to the extent the complaint alleges a battery claim, the claim must be directed at the City rather than the officers individually.

And, to the extent Pennington alleges a state law battery claim against the City, such claim would be consistent with the excessive force claims discussed above. *See supra* Section III.B. Whether a state law battery claim has, in fact, been alleged by Pennington will be discussed at the upcoming Final Pretrial Conference. Pennington should be prepared to discuss whether she believes she has alleged such a claim and whether she intends to pursue it at trial.

Lastly, the Defendants argue that any state law claims (e.g., negligence) against Marion County and the Marion County Sheriff have been waived because she did not file a tort claim notice in accordance with the Indiana Tort Claims Act ("ITCA"). Pennington does not dispute this fact. Thus, Marion County and the Marion County Sheriff are entitled to summary judgment to the extent Pennington's complaint alleges any state law claims against them.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (dkt. no. 32) is **GRANTED IN PART AND DENIED IN PART**. For purposes of clarity, the Court notes that only the excessive force claim(s) against Officer Owens related to his taser use remains (and perhaps a battery claim against the City relating to the same taser use). All other claims against all other Defendants have been adjudicated.

Additionally, the final pretrial conference in this matter remains scheduled for **Friday, March 27, 2015, at 10:00 am**, and the three-day jury trial remains scheduled to begin on **April 27, 2015 at 9:00 am.** Both will be held in Room 202 of the United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana, before Judge William Lawrence. The parties are reminded of the related pretrial deadlines set forth in their case management plan (dkt. no. 13).

SO ORDERED: 3/06/15

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.